IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                                                                                                  No. 21-cr-00490-JCH

RICHARD RODRIGUEZ-AGUIRRE

    Defendant.

## MEMORANDUM OPINION AND ORDER

Richard Rodriguez-Aguirre faces charges for being a felon in possession of a firearm. In preparation for trial, the United States filed a *Motion in Limine to Admit 911 Call* (ECF No. 47). The United States asks the Court to rule that a twenty-one-minute phone call from Jane Doe to 911 is admissible. The Court defers an answer on admission. But two narrower rulings are appropriate. First, the Sixth Amendment's Confrontation Clause does not bar the phone call because the conversation was not testimonial. Second, Federal Rule of Evidence 802's prohibition against hearsay does not bar Jane Doe's hearsay statements during the phone call because they were excited utterances.

**I.    Background**

Jane Doe called 911 on June 26, 2020. *See* ECF No. 47, at 1; Def.'s Resp. 1, at 1. Ms. Doe said that she returned home to find her recently separated husband, whom she identified as Richard Rodriguez. (For simplicity, the Court will call the husband and defendant Mr. Rodriguez-Aguirre. In doing so, the Court does not foreclose any challenges based on misidentification.). Mr. Rodriguez-Aguirre, according to Ms. Doe, assaulted her. Ms. Doe explained that she was calling from neighbor's phone, that the neighbor was with her outside of their apartments, and that the

1

assault took place five to ten minutes before the call. Telephone Call by Jane Doe to 911 Dispatch, at 0:00-1:26, 3:14-3:20 (June 26, 2020).

Ms. Doe relayed that Mr. Rodriguez-Aguirre hit her several times, hit her on the head, pushed her to the ground, and prevented her from getting up. Then, Ms. Doe recounted, Mr. Rodriguez-Aguirre took her phone and wallet and left for a nearby park. Ms. Doe stated that she went to the park to get her belongings. And at the park, Ms. Doe said, Mr. Rodriguez-Aguirre pointed a gun at her "like he was running after me to shoot me." *Id.* at 0:00-1:26.

Ms. Doe repeated these allegations as the call progressed. She emphasized that she wanted to return to the park because Mr. Rodriguez-Aguirre had all of her money. When asked by dispatch, Ms. Doe elaborated on different details. In particular, Ms. Doe answered questions about the gun that Mr. Rodriguez-Aguirre allegedly pointed at her. The dispatcher assured Ms. Doe that officers were on their way. *Id.* at 1:26-5:13.

Part way through the call, Ms. Doe said that she could hear Mr. Rodriguez-Aguirre yelling. The dispatcher asked if Ms. Doe could go inside her neighbor's apartment. Ms. Doe did so after asking for permission. Right after that, Ms. Doe said that Mr. Rodriguez-Aguirre was in the apartment complex. Ms. Doe conveyed that her neighbor locked the door. Ms. Doe spoke frightfully: "please send somebody, please," "oh my god," "please send somebody." The dispatcher advised Ms. Doe to take a deep breath. *Id.* at 5:14-7:45.

As the call continued, Ms. Doe continued to say things like "oh my god" and "he has all my bank cards, all my money, everything is in there, and my phone." The dispatcher asked Ms. Doe different questions. But along with answering them, Ms. Doe said: "oh my god, are they coming?," "He's still yelling out there," and "He said, 'get out here now, fucker.'" *Id.* at 7:45-11:18.

At some point, Ms. Doe told the dispatcher, "He's saying I'll be back tomorrow. Please send somebody. I need to get my stuff from him. You guys need to hurry up." The dispatcher tried to reassure Ms. Doe that officers were on their way. But Ms. Doe expressed urgency: "Yeah but by the time they come, it's going to be too late. He has everything that I own. Everything." Eventually, Ms. Doe said that she could no longer hear Mr. Rodriguez-Aguirre. *Id.* at 11:19-12:47.

Even though Ms. Doe stopped hearing Mr. Rodriguez-Aguirre, she did not relax. She panicked that her belongings were gone and that she could not return safely to her apartment: "He's probably already gone already. And there's nothing you guys are going to be able to do. And now I'm not going to be able to go into my apartment. 'Cause I don't know if he's going to come back." The dispatcher asked if Ms. Doe remained with her neighbor. When she said that she was still in his apartment, the dispatcher warned, "Stay in there. Don't get out." *Id.* at 12:48-14:10.

The conversation continued in much the same way. The dispatcher tried to assure Ms. Doe that officers were approaching; Ms. Doe despaired that Mr. Rodriguez-Aguirre had fled with her belongings. Ms. Doe said, "It's too late. I can go out there and find him." The dispatcher implored, "Stay right there. 'Cause they're going to go up to the apartment to meet with you." Ms. Doe persisted in stating her needs for her wallet and phone; she also discussed related matters. She said that she could not call her bank to cancel her cards because Mr. Rodriguez-Aguirre had her phone. The dispatcher asked filler questions—such as where Ms. Doe banked—which she answered. Ms. Doe expressed, "I want to go out there and go look for him myself. That's what I want to do. I want to go out to the park and see if he dumped everything out there." The dispatcher sympathized, "I know it's frustrating. The offices are going to be with you first." *Id.* at 14:11-20:50.

Finally, officers arrived at the neighbor's apartment. The dispatcher told Ms. Doe that they wanted to meet with her. But the dispatcher advised Ms. Doe to remain on the phone until she was

with these officers: "Let me know when you're talking to them." Only once she was with them did the dispatcher say, "I'll let you go ma'am." The call ended. *Id.* at 20:51-21:31.

**II.      Standard**

This motion presents a preliminary question of whether evidence is admissible. *See* Fed. R. Evid. 104(a). A preponderance of the evidence standard applies to the resolution of such questions. *See Bourjaily v. United States*, 483 U.S. 171, 175-76 (1987). And the burden to meet the preponderance standard belongs to the proponent of the evidence. *See United States v. Alcorta*, 853 F.3d 1123, 1139-40 (10th Cir. 2017); *see also United States v. Jackson*, 636 F.3d 687, 695-96 & n.4 (5th Cir. 2011) (citing United States v. Arnold, 486 F.3d 177, 213-14 (6th Cir.2007) (en banc) (Moore, J., dissenting)) (explaining how burden allocation and preponderance standard extend to admissibility questions that implicate Confrontation Clause).

**III.     Discussion**

The United States seeks to admit a recording of the twenty-one minute 911 call. To support this request, the United States argues why two obstacles to admission do not apply. First, says the United States, the Confrontation Clause does not apply because statements in the call are non-testimonial. Second, continues the United States, the rule against hearsay does not apply because statements in the call are excited utterances.

The United States is correct that the two identified obstacles to admission do not apply. As for the blanket request to admit the entire call, however, the Court reserves ruling. The Court thus holds as follows. First, the phone call is not testimonial evidence, so the Sixth Amendment's Confrontation Clause is no bar to the call's admission. Second, Ms. Doe's hearsay statements during the phone call fall under the excited-utterance exception to the rule against hearsay.

A.     **Confrontation Clause**

The Sixth Amendment guarantees a criminal defendant the right "to be confronted with the witnesses against him." U.S. Const. amend. VI. Because of this right, "[t]estimonial statements of witnesses absent from trial [are admissible] only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." *Crawford v. Washington*, 541 U.S. 36, 59 (2004). Non-testimonial statements, by contrast, do not implicate the Confrontation Clause. Were Ms. Doe's statements in the 911 call testimonial?

"A testimonial statement is a 'formal declaration made by the declarant that, when objectively considered, indicates' that the 'primary purpose of the [statement is] to establish or prove past events potentially relevant to later criminal prosecution.'" *United States v. Morgan*, 748 F.3d 1024, 1038 (10th Cir. 2014) (alteration in original) (quoting *United States v. Smalls*, 605 F.3d 765, 777-78 (10th Cir. 2010)). A juxtaposition of two domestic-violence cases is illustrative.

In *Davis v. Washington*, Michelle McCottry called 911. *See* 547 U.S. 813, 817 (2006). Ms. McCottry's former boyfriend, Adrian Davis, had just assaulted her and fled. *See id.* at 817-18. The Supreme Court held that Ms. McCottry's statements in the 911 call were non-testimonial and thus did not implicate the Confrontation Clause. *See id.* at 827-28. The Court offered four reasons why.

First, Ms. McCottry described events as they unfolded. *See id.* at 827. Second, Ms. McCottry faced an ongoing emergency. *Id.* ("McCottry's call was plainly a call for help against bona fide physical threat."). Third, Ms. McCottry's statements were imperative to resolve a present emergency rather than simply descriptive of past events. *See id.* And fourth, Ms. McCottry's answers were frantic and made over the phone in a stressful and dangerous environment. *See id.*

*Davis*'s companion case was *Hammon v. Indiana*. 547 U.S. 813, 819 (2006). Police responded to a domestic disturbance at the home of Hershel and Amy Hammon. *See id.* Amy said

5

that she was fine and permitted the officers to enter. *See id.* One of the officers spoke with Hershel in the kitchen; the other talked with Amy in the living room. *See id.* Hershel tried to participate in Amy's conversation with the police, but the officers prohibited him from doing so. *See id.* Eventually, Amy wrote and signed a battery affidavit, which detailed how Hershel attacked Amy and her daughter. *See id.* The Supreme Court held that Amy's statements were testimonial and thus implicated the Confrontation Clause. *See id.* at 829-31. The Court returned to the same reasons it considered in *Davis*. In *Hammon*, however, they cut the opposite way. *See id.*

First, Amy described not unfolding events but ones from the past. *See id.* Second, Amy did not face an ongoing emergency—rather, she was protected by police. *See id.* ("[T]he interrogating officer testified that he had heard no arguments or crashing and saw no one throw or break anything. When the officers first arrived, Amy told them that things were fine, and there was no immediate threat to her person." (citations omitted)). Third, Amy's statements were not meant to resolve an emergency; instead they assisted an officer's investigation. *See id.* And fourth, Amy's statements bore indicia of formality: Amy was in a separate room with an officer, the officers prevented Hershel from interrupting, and Amy deliberately recounted her statements. *See id.*

*Davis* and *Hammon* thus occupy opposing sides of a spectrum. And this case is firmly on the side of *Davis*. First, Ms. Doe described unfolding events. She detailed how Mr. Rodriguez-Aguirre "*has* all my bank cards, all my money, everything is in there, and my phone." 911 Call at 9:33 (emphasis on present tense added). The dispatcher asked about whether she could see Mr. Rodriguez-Aguirre, and Ms. Doe described his changing locations. Second, Ms. Doe faced an objective emergency. During the call, Ms. Doe recounted how Mr. Rodriguez-Aguirre was yelling, "get out here now, fucker." *Id.* at 10:22. The dispatcher even told Ms. Doe to shelter in her neighbor's apartment. She repeatedly pleaded, "Please send somebody, please." *Id.* at 5:40. In fact,

6

the dispatcher did not let Ms. Doe go until the police arrived. *Id.* at 21:00. Third, the dispatcher's questions were necessary to resolve the emergency: he asked questions that would direct officers to the scene and prepare them for the threat that Mr. Rodriguez-Aguirre posed. And fourth, the 911 call was not a formal interview meant to investigate a past crime. Rather, Ms. Doe's statements sought to ensure her safety and secure her essential belongings.

Finally, it is true that non-testimonial statements can evolve into testimonial ones. *See Davis*, 547 U.S. at 828-29. No such evolution happened here. Ms. Doe urged the dispatcher to send the officers quickly while they still had an (ongoing) chance to arrest Mr. Rodriguez-Aguirre and return her belongings. And unlike Amy Hammon, Ms. Doe never had the security of an officers' presence. All in all, none of Ms. Doe's statements became testimonial. The Confrontation Clause, therefore, does not bar their admissibility.

### B. Hearsay

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." *United States v. Lovato*, 950 F.3d 1337, 1341 (10th Cir. 2020) (quoting *United States v. Collins*, 575 F.3d 1069, 1073 (10th Cir. 2009). If a statement is offered to prove something other than the truth of the matter asserted, then it is not hearsay. *See United States v. Ledford*, 443 F.3d 702, 707 (10th Cir. 2005), *abrogated on other grounds by Henderson v. United States*, 575 U.S. 622 (2015). The Federal Rules of Evidence prohibit the admission of hearsay, subject to certain exemptions and exceptions. *See* Fed. R. Evid. 801-804; *Lovato*, 950 F.3d at 1341. One exception, analyzed below, is for excited utterances. *See* Fed. R. Evid. 803(2); *Ledford*, 443 F.3d at 710.

1.	**Scope of Analysis**

The Court first addresses how it should analyze the call. The United States writes, "[o]nce the Court determines that the 911 call is not testimonial, it need only then find that it is an excited utterance to permit its introduction at trial." ECF No. 47, at 4. This statement includes an implicit request: the United States wants the Court to consider the 911 call as a single unit. In other words, the United States does not want the Court to parse the call into individual statements. Mr. Rodriguez-Aguirre, however, disagrees. He writes, "The Government should be required to specifically identify which statements and conversations should be allowed." ECF No. 59, at 1.

The Tenth Circuit recently held that a district court did not abuse its discretion when it considered the admissibility of a 911 call as whole under the present-sense-impression exception to the hearsay rule. *Lovato*, 950 F.3d at 1343; *see also* Fed. R. Evid. 803(1). In doing so, the Circuit distinguished *Williamson v. United States*, in which the Supreme Court held that courts must analyze particular statements when applying the statement-against-interest exception. *See Lovato*, 950 F.3d at 1342 (citing *Williamson*, 512 U.S. 594, 599 (1994)); *see also* Fed. R. Evid. 804(b)(3). But the Circuit was also clear that a district court would not abuse its discretion by applying the present-sense-impression exception to only particular statements. *See Lovato*, 950 F.3d at 1342.

The Court need not decide whether *Lovato* or *Williamson* controls the analysis for the excited-utterance exception to the hearsay rule. A focus on this motion's procedural posture and our system of party autonomy shows how the Court can (and should) avoid deciding the unit of analysis for the 911 call. A leading treatise that explains our system of party autonomy bears repeating: "[N]either party bears a 'duty' not to introduce hearsay nor a 'right' not to have hearsay used against them; but both have a 'power' to have hearsay excluded—if they choose to and 'properly' exercise that 'power.'" 21 Daniel Blinka, *Federal Practice and Procedure (Wright &*

8

*Miller*) § 5032, Westlaw (database updated Apr. 2022). In line with this system, parties typically ask courts to exclude evidence, and courts generally make evidentiary rulings after objections.

Here, however, the United States asks the Court to *admit* evidence. Because the Court is deciding the United States' motion, the Court will proceed with the United States' unit of analysis—that is, the entire call. But the Court will only address the United States' preempted objections that both parties briefed: the Confrontation Clause (described above) and the rule against hearsay (described here). As for the admissibility of the entire call, the Court defers ruling until trial. There, the United States can still move to admit the call, and Mr. Rodriguez-Aguirre can object to some or all of it.

### 2. Truth of the Matter Asserted

The United States' argument that the 911 Call is an excited utterance includes an implicit concession: the call, when considered as a single unit, is hearsay. After all, the United States would not need to characterize the call as an excited utterance if it were not hearsay. The Court accepts this implicit concession. Although the call includes some questions and imperatives, the main thrust of the call is that Mr. Rodriguez-Aguirre attacked Ms. Doe with a gun, took her belongings, and fled. And the United States seemingly wants to admit this call to prove the fact that Mr. Rodriguez-Aguirre possessed a gun. The call, when analyzed as a whole, is thus hearsay.

### 3. Excited Utterance

Excited utterances are excepted from the rule against hearsay. *See* Fed. R. Evid. 803(2) (defining excited utterance as "[a] statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused"). The excited-utterance exception to the hearsay rule has three requirements: "(1) there was a startling event; (2) the statement was

made while the declarant was under the stress of excitement from this event; and (3) the statement related to this event." *Ledford*, 443 F.3d at 710. Ms. Doe's 911 call satisfies all three.

First, a startling event occurred. Ms. Doe alleged that Mr. Rodriguez-Aguirre attacked her, took her important belongings, and demanded that she exit the apartment. *See id.* (holding that domestic violence was startling event). Second, Ms. Doe's statements were made under the stress of excitement. Ms. Doe repeatedly pled with the 911 dispatcher to send someone. And at some point, the 911 dispatcher told Ms. Doe to take a deep breath. *See* 911 Call at 6:28. What is more, the alleged attack took place just five to ten minutes before the call, and Mr. Rodriguez-Aguirre even allegedly yelled at Ms. Doe during the call. *See Ledford*, 443 F.3d at 711 (admitting statement made thirty to thirty-five minutes after assault). And third, the 911 call related to the event. Ms. Doe's aim was to ensure her safety and secure her belongings. *See id.* at 712. Thus, even though the 911 call—when analyzed as a whole—is hearsay, it falls within the excited utterance exception.

## IV.   Conclusion

**IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED** that the *United States' Motion in Limine to Admit 911 Call* (**ECF No. 47**) is **GRANTED IN PART** and **DEFERRED IN PART**:

1. The Court reserves ruling on whether the 911 call is admissible;

2. The Sixth Amendment's Confrontation Clause does not prohibit the admission of the 911 call; and

3. Federal Rule of Evidence 802 does not prohibit the admission of the entire 911 call.

_____
SENIOR UNITED STATES DISTRICT JUDGE